IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-13

 No. 178A20

 Filed 12 March 2021

 IN THE MATTER OF: Z.J.W.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 23

 September 2019 by Judge Elizabeth Freshwater-Smith in District Court, Nash

 County. Heard in the Supreme Court on 17 February 2021.

 Jayne B. Norwood for petitioner-appellee Nash County Department of Social
 Services.

 Poyner Spruill LLP, by Caroline P. Mackie, for appellee Guardian ad Litem.

 Garron T. Michael for respondent-appellant father.

 ERVIN, Justice.

¶1 Respondent-father Scott A. appeals from a trial court order terminating his

 parental rights in his minor child Z.J.W.1 After careful consideration of respondent-

 father’s challenges to the trial court’s termination order in light of the record and the

 applicable law, we reverse the trial court’s order, in part; vacate the trial court’s order,

 in part; and remand this case to the District Court, Nash County, for further

 proceedings not inconsistent with this opinion.

 1 Z.J.W. will be referred to throughout the remainder of this opinion as “Jill,” which is

 a pseudonym used for ease of reading and to protect the identity of the juvenile.
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

¶2 Jill was born in August 2008 to respondent-father and the mother, Amy T.2

 The parents, who were never married and whose relationship was marred by

 incidents of domestic violence, also had a son,3 who was born in October 2006. As a

 result of the level of conflict between the parents, the mother would routinely retreat

 to Nash County, where a number of the members of her family lived, during difficult

 times. Eventually, the mother left respondent-father and Steven in Buncombe

 County and moved to Nash County with Jill. Respondent-father had no further

 contact with Jill for many years after her departure for Nash County.

¶3 The mother married another man after relocating to Nash County. On 29

 January 2015, allegations of neglect relating to Jill were made to the Nash County

 Department of Social Services. During the ensuing investigation, the mother’s

 husband admitted that he had had sexual fantasies involving Jill. After DSS

 provided assistance to respondent-mother and her husband, the investigation into

 the neglect allegations relating to Jill was closed on 11 August 2015.

¶4 On 25 June 2017, the Nash County DSS received a child protective services

 report relating to an incident of domestic violence involving the mother and her

 husband. In the course of the resulting investigation, the mother reported that her

 2 Although the trial court terminated the mother’s parental rights in Jill in the order

 that is before us in this case, she did not seek appellate review of the trial court’s decision
 and is not a party to the proceedings on appeal.
 3 The parents’ son will be referred to throughout the remainder of this opinion as

 “Steven,” which is a pseudonym used for ease of reading and to protect the juvenile’s privacy.
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 husband had raped her earlier in the evening, that he had previously committed acts

 of sexual abuse against Jill, and that she had allowed the husband to continue to live

 in the family home with Jill despite her knowledge of his conduct. In addition, the

 husband admitted that he had sexually abused Jill on several occasions. As a result,

 the mother and the husband were arrested and charged with the commission of

 several criminal offenses while Jill was placed with her maternal aunt.

¶5 On 14 July 2017, a social worker employed by the Nash County DSS contacted

 respondent-father and informed him about Jill’s situation. At that time, respondent-

 father stated that he could not remember the last time that he had seen Jill.

 Although he claimed that he had spoken with Jill over the phone since the last time

 that he had seen her, respondent-father could not provide the date upon which this

 conversation had occurred. Respondent-father did not, at any point during this

 conversation, question the social worker about Jill’s well-being or where she was

 living. In spite of the fact that the social worker provided respondent-father with her

 own contact information, he did not make any further effort to communicate with the

 social worker.

¶6 In October 2017, the Buncombe County Department of Social Services filed a

 petition alleging that Steven was an abused, neglected, and dependent juvenile and

 obtained the entry of an order placing him in nonsecure custody. In its petition, the

 Buncombe County DSS alleged that it had received a child protective services report
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 on 9 December 2016 asserting that respondent-father had been involved in a physical

 altercation with his own mother in Steven’s presence. On 29 March 2018, Judge

 Susan M. Dotson-Smith entered an order finding Steven to be a neglected and

 dependent juvenile. On 12 June 2018, Judge Ward D. Scott entered a dispositional

 order placing Steven in the custody of the Buncombe County DSS and ordering

 respondent-father to submit to random drug screens, obtain a psychosexual

 evaluation, and complete a parenting class.

¶7 On 10 January 2018, the Nash DSS filed a petition alleging that Jill was an

 abused and neglected juvenile. In its petition, the Nash County DSS alleged, among

 other things, that the husband had admitted to having sexually abused Jill and that

 the mother had, despite her knowledge of the husband’s fantasies about having

 sexual contact with Jill, enabled the husband’s abuse of Jill by burning Jill’s diary,

 in which Jill described the mistreatment that she had experienced, and continuing to

 live with the husband despite her knowledge of his conduct.

¶8 After a hearing held on 7 June 2018, Judge Wayne S. Boyette entered an order

 on 27 July 2018 finding Jill to be an abused and neglected juvenile. In his order,

 Judge Boyette found that, while respondent-father did not have a relationship with

 Jill and had not seen her in over six years, he had expressed a desire to have custody

 of her. Judge Boyette placed Jill in the custody of the Nash County DSS, sanctioned

 a permanent plan of reunification with a concurrent plan of adoption, and prohibited
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 visitation between respondent-father and Jill “until [such visitation was]

 recommended by [Jill’s] therapist.” Finally, Judge Boyette ordered respondent-father

 “to work with [the Buncombe County DSS] and complete their court ordered

 recommendations and service plan.” As of October 2018, Judge Dotson-Smith had

 determined that respondent-father had “completed all recommendations” imposed by

 the District Court and the Buncombe County DSS.

¶9 On 20 February 2019, the Nash County DSS filed a motion to terminate

 respondent-father’s parental rights in Jill. In its termination petition, the Nash

 County DSS alleged that Jill was an abused and neglected juvenile and that there

 was a reasonable probability that she would experience abuse and neglect in the

 future in the event that she was to be returned to respondent-father’s care, see

 N.C.G.S. § 7B-1111(a)(1) (2019), and that respondent-father had willfully abandoned

 Jill, see N.C.G.S. § 7B-1111(a)(7) (2019).

¶ 10 On 5 March 2019, Judge Pell C. Cooper entered a permanency planning order

 that changed the primary permanent plan for Jill to adoption with a secondary plan

 of reunification. Following a hearing held on 7 March 2019, at which respondent-

 father was, for the first time, physically present, Judge Anthony W. Brown entered a

 permanency planning order on 15 April 2019. In his order, Judge Brown found that

 respondent-father had sent a few e-mails to the maternal aunt, with whom Jill

 continued to be placed, and that respondent-father was financially able to parent Jill.
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 In addition, Judge Brown ordered the Nash County DSS to “inform the therapist to

 contemplate the issue of visitation by [respondent-father] with [Jill].”

¶ 11 As the result of a hearing held on 4 April 2019, Judge Cooper entered a

 permanency planning order on 15 May 2019 in which he permitted respondent-father

 to initiate contact with Jill by writing her a letter to be screened by the Nash County

 DSS and the guardian ad litem before it could be presented to Jill. In addition, Judge

 Cooper ordered respondent-father to actively participate in all Child and Family

 Team meetings and to appear at all hearings that were held for the purpose of

 considering his situation with respect to Jill.

¶ 12 After a hearing held on 13 June 2019 which respondent-father attended

 telephonically, the trial court entered a permanency planning order on 23 July 2019.

 In its order, the trial court found that Jill had been receiving therapy from Annie

 Shaw since March 2018 for the purpose of addressing concerns arising from the

 sexual abuse that she had experienced at the hands of the mother’s husband.

 However, Ms. Shaw did not believe that it was her role to make a recommendation

 concerning the issue of whether respondent-father should visit with Jill and stated

 that she “had never intended to do so.” Instead, Ms. Shaw had only intended to assist

 Jill in preparing for such a visit in the event that one was to occur and declined to

 express an opinion concerning whether it would be “harmful or helpful” for Jill to visit

 with respondent-father. The trial court found, on the other hand, that the Nash
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 County DSS and counsel for the parties had believed that Ms. Shaw would make a

 recommendation concerning the issue of visitation and had acted in accordance with

 that belief.

¶ 13 The issues raised by the termination motion came on for hearing before the

 trial court on 25 June 2019 and 25 July 2019. On 23 September 2019, the trial court

 entered an order concluding that both grounds for termination alleged in the

 termination motion existed and that it would be in Jill’s best interests for respondent-

 father’s parental rights to be terminated. As a result, the trial court terminated

 respondent-father’s parental rights in Jill. See N.C.G.S. § 7B-1110(a) (2019).

 Respondent-father noted an appeal to this Court from the trial court’s termination

 order.

¶ 14 In seeking relief from the trial court’s termination order before this Court,

 respondent-father argues that the trial court erred by determining that his parental

 rights in Jill were subject to termination on the basis of neglect, N.C.G.S. § 7B-

 1111(a)(1), and willful abandonment, N.C.G.S. § 7B-1111(a)(7). According to well-

 established North Carolina law, trial courts utilize a two-step process in determining

 whether a parent’s parental rights in a child should be terminated that consists of an

 adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). At

 the adjudicatory stage, the petitioner bears the burden of proving by “clear, cogent,

 and convincing evidence” the existence of one or more of the grounds for termination
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 delineated in N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(e)–(f) (2019). This Court

 reviews a trial court’s adjudication decision in order “to determine whether the

 findings are supported by clear, cogent and convincing evidence and the findings

 support the conclusions of law.” In re Montgomery, 311 N.C. 101, 111 (1984) (citing

 In re Moore, 306 N.C. 394, 404 (1982)). “If [the trial court] determines that one or

 more grounds [for termination] listed in section 7B-1111 are present, the court

 proceeds to the dispositional stage, at which the court must consider whether it is in

 the best interests of the juvenile to terminate parental rights.” In re D.L.W., 368 N.C.

 835, 842 (2016) (citing In re Young, 346 N.C. 244, 247 (1997); N.C.G.S. § 7B-1110).

¶ 15 In support of its adjudication decision, the trial court found as a fact that:

 7. The Court takes judicial notice of the court order in
 the underlying action adjudicating [Jill] as an
 abused and neglected juvenile[.]

 ....

 9. The relationship between [the parents] was
 problematic and [the mother] frequently left the
 home and came to Nash County to be with her
 family. . . . [The parents] moved to Buncombe
 County where [Jill] was born. While living in
 Buncombe County, they each sought and obtained
 Domestic Violence Protection orders [(DVPO)] on
 each other.

 10. After [the mother] left [respondent-father] for the
 final time in 2010, she returned to live with family
 in Nash County. [The mother] left with [Jill] and
 [Steven] remained with [respondent-father]. In
 Nash County[, the mother] obtained a DVPO against
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 [respondent-father]. As a part of the DVPO order
 [respondent-father] was allowed to have supervised
 visitation at the Nashville Police Department.
 [Respondent-father] did not attend the DVPO
 hearing, nor did he ever exercise his visitation with
 [Jill]. [Respondent-father] has not seen [Jill] since
 she and her mother left Buncombe County in 2010.
 Although he believed they were in Nash County,
 [respondent-father] made no known efforts to find
 [Jill] or her mother. [The mother] changed her
 phone number and [respondent-father] stated he
 had no way to contact her as her family reportedly
 told him they did not know where [the mother] and
 [Jill] were located. [The maternal aunt] says she
 was never contacted by [respondent-father] until he
 was provided with the email address of [Jill’s]
 placement by the Department in 2018. [Respondent-
 father] knew where [the mother’s] mother resided in
 Nash County having visited [the mother] there
 previously. [The mother’s] mother and family
 continue to reside in the same homes they lived in at
 the time of the visits by [respondent-father].

....

12. In 2017, [respondent-father] was made aware that
 there was a child protective services investigation in
 Nash County involving [Jill]. Due to confidentiality
 he was not given specific details. However,
 [respondent-father] admits that although knowing
 what he did know, he still made no effort to contact
 [the mother’s] relatives in Nash County to check on
 his daughter nor did he inquire about her well-being
 with the Nash County social worker.

13. Nash County social worker, Roxanne Hill, contacted
 [respondent-father] by phone on July 14, 2017
 informing him of the child protective services
 investigation involving [Jill]. During that
 conversation [respondent-father] was unable to
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 recall when he had last seen [Jill] but [h]e had
 spoken with her but could not remember when that
 had transpired. He stated he was focused on
 [Steven] and had no time for anything else, stating
 [Steven] is a “hand full”. He did not ask about [Jill’s]
 well-being or where she was living, although that
 information was available to him at the time.

14. At the time of the Nash County investigation with
 [Jill], [Buncombe DSS] had an open investigation
 with [respondent-father] concerning [Steven]. . . .
 [Steven] was adjudicated neglected and dependent
 in Buncombe County on February 22, 2018 and
 placed in the custody of Buncombe County.

15. Prior to being removed from his father, [Steven] did
 not attend school. [Respondent-father] attempted to
 home school [Steven] but never completed the
 required documents regarding attendance for
 [Steven] to receive credit. When [Steven] entered
 foster care and was enrolled in public schools, he was
 found to be behind academically. His grades and
 academic progress improved while he was in foster
 care.

....

18. [Respondent-father] stated he began attending
 therapy at Family Preservation a week after
 [Steven] was removed from his care. Jane Jones,
 Social Worker with Family Preservation Services
 worked with [respondent-father] from November 9,
 2017 until October 2018 when he was no longer
 eligible for their services due to a change in their
 mandate for services. On June 6, 2019, [h]e
 returned to Family Preservation and continues to be
 seen. Ms. Jones had no knowledge of the issues
 regarding his involvement with Buncombe County
 and did not inquire. She did attend two [CFT]
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 meetings at Buncombe [DSS] and believes he
 completed the goals set for him. . . .

....

20. [Respondent-father] has never been employed for
 more than a few weeks at a time. He was diagnosed
 with Crohn’s Disease at age 13 and was approved for
 disability in 2002. [Respondent-father] receives
 $770.00 monthly in disability of which $50.00 is
 deducted for child support for [Jill] and $350.00 in
 Food and Nutrition benefits. [Respondent-father]
 never voluntarily paid child support and payments
 did not begin until January 4, 2019 from his social
 security benefits. He struggles to provide for himself
 and [Steven] and according to [respondent-father]
 his sister assists him financially when he needs help.
 At times, he cannot pay his rent. He does not have
 a driver’s license and he has not had a motor vehicle
 in over ten years.

21. [Respondent-father] did not attend any hearings
 regarding [Jill] until after [DSS] filed the [m]otion to
 terminate his parental rights on February 20, 2019.
 He participated by phone for two hearings and only
 attended five. Two of which were hearings on the
 [m]otion to terminate his parental rights.

22. [Respondent-father] attended court hearings
 regarding [Steven] in Buncombe County but did not
 initially comply with their case plan. The Court
 ordered that he submit to a Psychosexual
 Evaluation which he did not do in a timely manner.
 The therapist attended a hearing in Buncombe
 County to request additional information that she
 did not receive from [respondent-father] so that the
 evaluation could be completed.

23. The plan in Buncombe County was completed by
 [respondent-father] and as his plan in Nash County
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 was to complete the Buncombe County plan, the
 Nash County plan was also completed.

 23.4 There were Domestic Violence orders involving
 [respondent-father] and his mother . . . in Buncombe
 County. Due to the volatile relationship and verbal
 altercations in the presence of [Steven,] [respondent-
 father’s] mother was not to be present in the home[.]
 In October of 2018, [respondent-father] was
 hospitalized and had surgery. Upon his discharge
 from the hospital, [his mother] moved into [his]
 home to care for him in violation of the Buncombe
 [DSS] plan. . . .

 24. [Respondent-father] states he had no one else who
 could or would assist him and his condition was such
 that he was unable to care for himself. He states he
 has no friends or any support system that could have
 helped him during his recovery.

 25. [Respondent-father] was contacted by Foster Care
 Supervisor, Stephanie Grischow on a regular basis
 to keep him informed about [Jill]. Ms. Grischow
 initiated the contacts between [respondent-father]
 and herself. She often left messages for him to
 return her call. It would require multiple messages
 from Ms. Grischow before her calls would be
 returned. [Respondent-father] missed three
 consecutive meetings. Ms. Grischow contacted him
 encouraging him to attend and participate in the
 meetings. He participated in some Child and Family
 Team Meetings by phone.

 26. On July 26, 2018 [respondent-father] was provided
 the email address of [the maternal aunt] so that he
 could contact her and inquire about [Jill] and her
 wellbeing. Again on August 27, 2018 and September
 18, 2018 he was given the email address because he

4 The trial court’s order had two findings of fact numbered 23.
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 said he had lost the address. The first email to [the
 maternal aunt] was sent September 18, 2018. There
 was a total of twelve emails in fourteen months:
 November 9, 2018, December 19, 2018, December
 27, 2018, February 22, 2019, February 26, 2019,
 March 3, 2019, March 21, 2019, April 20, 2019, May
 7, 2019, and May 22, 2019. [The maternal aunt]
 responded to all the emails received. [Respondent-
 father] at times sent pictures of clothing to [the
 maternal aunt] asking for [Jill’s] size and whether
 [Jill] would like them. He never sent anything. He
 has not sent her cards or gifts for her birthdays or
 holidays since she moved to Nash County in 2010.
 [The mother] denies blocking [respondent-father]
 from Facebook.

27. . . . . [Respondent-father] made no effort to locate his
 daughter or inquire of her maternal family about her
 well-being or whereabouts since [respondent-
 mother] and [Jill] left his home in 2010. By his own
 statements, [respondent-father] did not make efforts
 as he had his hands full with [Steven]. He was
 provided [the maternal aunt’s] e-mail address and
 did not even utilize the email to contact [the
 maternal aunt] for two months after having the
 address as he lost it twice. And even then,
 [respondent-father] only sent twelve emails in over
 a year’s time. [Jill] was 9 years old, before
 [respondent-father’s] paternity was established and
 it was only done . . . at the request and effort of [Nash
 DSS]. [Respondent-father] stated he was not a legal
 expert and did not know how to go about
 establishing he was her father. Yet paternity of
 [Steven] was established by Buncombe County over
 six months prior to the testing for [Jill] and he did
 not inquire about testing for [Jill] even after
 becoming aware of the process. . . .

....
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

30. [Jill] is in therapy to address the trauma of her
 sexual abuse. Due to scheduling conflicts with the
 previous therapist, Annie Shaw, and travel issues, it
 was in [Jill’s] best interest to change therapist[s].

31. While under Ms. Shaw’s care, [respondent-father]
 was allowed to write [Jill] a letter. The letter was
 reviewed by [Nash DSS]. Ms. Shaw read the letter
 to [Jill] in a therapy session. Ms. Shaw assisted [Jill]
 in processing her feelings after hearing the letter.
 Previously, [Jill] had expressed interest in the
 possibility of seeing her father and asking him why
 he had not been in her life for seven years. After
 hearing the letter, she no longer wanted to see him
 stating the letter made her feel “icky” and that it
 made her think of the “other one”, referring to [her
 stepfather]. [Respondent-father] has written a
 second letter which has been given to [Jill’s] current
 therapist, but [Jill] has not yet seen the letter.

32. All parties thought [Ms.] Shaw would be providing a
 recommendation to the Court regarding visitation
 by [respondent-father]. When Ms. Shaw testified in
 court on June 13, 2019, she stated “it was not, nor
 was it ever her role to make a recommendation
 regarding the father’s visitation[.]” Ms. Shaw only
 intended to prepare [Jill] for a visit if it were to be
 ordered by the Court.

33. [Respondent-father] through his inaction for most of
 [Jill’s] life prior to and including the six months
 immediately preceding the filing of the Motion to
 terminate parental rights, has displayed a willful
 neglect and refusal to perform the natural and legal
 obligations of parental care and support. He has
 withheld his presence, his love, his care. Further, he
 has failed to afford himself of the opportunities to
 display filial affection in such a manner that
 demonstrates he has relinquished all parental
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 claims. Therefore, he has neglected and abandoned
 [Jill].

 34. In light of [respondent-father’s] nearly complete
 absence from [Jill’s] life prior to the filing of the
 Motion to terminate parental rights, it is probable
 that neglect would continue if she were returned to
 his care.

 35. [Respondent-father] had the ability to achieve
 contact with [Jill] irrespective of his financial and
 social resources.

¶ 16 As an initial matter, respondent-father challenges the sufficiency of the

 evidentiary support for several of the trial court’s findings of fact. First, respondent-

 father contends that the portions of Finding of Fact No. 10 stating that the mother

 had left him “for the final time in 2010” and that he had not exercised the right to

 participate in supervised visitation with Jill as permitted by the Nash County DVPO

 order lack sufficient record support. A careful review of the record persuades us

 respondent-father’s contention has merit given that nothing in the record provides

 support for the specific factual statements that respondent-father has contested. As

 a result, we will disregard the relevant portions of Finding of Fact No. 10 and those

 portions of Finding of Fact Nos. 26 and 27 that state that the mother left respondent-

 father in 2010, rather than 2011, in determining the extent to which the trial court’s

 findings of fact provide sufficient support for its determination that respondent-

 father’s parental rights in Jill were subject to termination on the basis of neglect and
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 willful abandonment. See In re N.G., 374 N.C. 891, 901 (2020) (disregarding findings

 of fact that were not supported by sufficient record evidence).

¶ 17 Secondly, respondent-father challenges the sufficiency of the evidentiary

 support for those portions of Finding of Fact Nos. 10 and 27 that state that he made

 no known efforts to locate the mother or Jill or to inquire of members of the mother’s

 family concerning Jill’s location or well-being since the mother left Buncombe County

 with Jill. At the termination hearing, respondent-father testified that he had

 contacted the mother’s family following her departure from Buncombe County with

 Jill and had been told that they did not know where the mother was and that

 respondent-mother had changed her phone number and blocked his ability to send

 Facebook messages to her. Although the trial court was not required to deem

 respondent-father’s testimony to be credible, see In re D.L.W., 368 N.C. 835, 843

 (2016), it appears that the trial court predicated the challenged portions of its findings

 of fact upon testimony presented by the maternal aunt at the dispositional phase of

 the proceeding to the effect that respondent-father had not made any contact with

 the mother’s family until he had been provided with her e-mail address by the Nash

 County DSS in 2018. In the event that the trial court relied upon this dispositional

 evidence as support for its adjudicatory finding that respondent-father had not made

 any efforts to locate the mother or Jill since their departure from Buncombe County,

 we agree with longstanding Court of Appeals precedent that it was error to do so. See
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 In re Mashburn, 162 N.C. App. 386, 396 (2004) (noting that a trial court should not

 consider testimony received at the dispositional phase of a termination proceeding in

 making adjudicatory findings of fact). As a result, we hold that the relevant portions

 of Finding of Fact Nos. 10 and 27 should not be considered in evaluating the validity

 of respondent-father’s challenges to the trial court’s adjudicatory decisions.

¶ 18 Similarly, respondent-father contends that the portion of Finding of Fact No.

 15 stating that Steven had been “behind academically” at the time that he entered

 foster care and enrolled in public school was not supported by the record evidence.

 However, a 12 June 2018 dispositional order entered in the Buncombe County

 proceeding regarding Steven that was admitted into evidence at the termination

 hearing reflects that, while Steven had been “doing well integrating into the 4th

 grade,” he was “on a first grade level in math” and had “advanced approximately two

 years in his math skills since being placed in his foster home five months ago.” As a

 result, we hold that the challenged portion of Finding of Fact No. 15 has sufficient

 evidentiary support.

¶ 19 Moreover, respondent-father argues that the portion of Finding of Fact No. 18

 indicating that “Ms. Jones[, a social worker with Family Preservation Services,] had

 no knowledge of the issues regarding his involvement with Buncombe County and did

 not inquire[ ]” into that subject mischaracterizes her testimony and contradicts the

 remainder of that finding, which states that Ms. Jones had attended two Child Family
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 Team meetings at Buncombe DSS and “believes he completed the goals set for him.”

 A careful review of the record satisfies us that Finding of Fact No. 18 does contain

 the internal inconsistency described in respondent-father’s brief and conflicts with

 Ms. Jones’ testimony at the termination hearing, which reflects an adequate

 understanding of the nature and extent of respondent-father’s involvement with the

 Buncombe County DSS. More specifically, Ms. Jones’ testimony reflects that she was

 familiar with the goals set out in respondent-father’s Buncombe County case plan

 and indicates that respondent-father had addressed domestic violence and substance

 abuse issues in the course of complying with the relevant plan requirements. For

 that reason, we will disregard the trial court’s statement in Finding of Fact No. 18

 that Ms. Jones lacked knowledge of the issues that were addressed during

 respondent-father’s period of involvement with the Buncombe County DSS in

 determining the validity of the trial court’s adjudicatory decision. See In re N.G., 374

 N.C. at 901.

¶ 20 Respondent-father also challenges the portion of Finding of Fact No. 21 which

 provides that he “did not attend any hearings regarding [Jill] until after the Nash

 County [DSS] filed the [m]otion to terminate his parental rights on February 20,

 2019[ ]” as not supported by the evidence. A careful review of the record clearly

 indicates respondent-father participated in the hearing concerning the underlying

 juvenile petition that was on held on 7 June 2018 by telephone. As a result, we will
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 disregard the challenged portion of Finding of Fact No. 21 in evaluating the

 correctness of the trial court’s adjudicatory determinations. See id.

¶ 21 Next, respondent-father contends the trial court’s statement in Finding of Fact

 No. 22 that he “did not initially comply” with his Buncombe County case plan conflicts

 with the record evidence. As the initial dispositional order entered in the Buncombe

 County proceeding on 12 June 2018 reflects, respondent-father was ordered to submit

 to random drug screens, participate in a psychosexual evaluation, and complete a

 parenting class in order to be reunited with Steven. However, the trial court

 determined in Finding of Fact No. 22, which has not been challenged as lacking in

 sufficient record support, that respondent-father did not complete the required

 psychosexual evaluation in a timely manner. In re Z.L.W., 372 N.C. 432, 437 (2019)

 (stating that unchallenged findings are deemed to have sufficient record support and

 are binding for purposes of appellate review). In addition, while respondent-father

 testified at the termination hearing that he began participating in his psychosexual

 evaluation as soon as he was ordered to do so, the therapist who conducted the

 evaluation had expressed concern about the extent to which respondent-father was

 “being forthright with regard to her evaluation,” a development that resulted in the

 holding of additional hearings “to decide how best to handle” the situation and a

 request on the part of the therapist to be allowed to review additional records. As a

 result, we hold that the trial court was entitled to infer from this evidence that
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 respondent-father had initially failed to comply with his Buncombe County case plan.

 See In re D.L.W., 368 N.C. at 843 (stating that the trial judge has the responsibility

 for considering the evidence, evaluating the credibility of the witnesses, and making

 any reasonable inferences that can be drawn from the record evidence).

¶ 22 In addition, respondent-father argues that the trial court erred by stating in

 Finding of Fact No. 24 that he “ha[d] no friends or any support system that could

 have helped him during his recovery” from surgery. According to respondent-father,

 his original plan following his discharge from the hospital in 2018 was to go to

 Virginia and stay with his sister. In support of this assertion, respondent-father

 relies upon testimony that his sister provided at the dispositional phase of the

 proceeding; however, as we have previously stated, such testimony is insufficient to

 support an adjudicatory finding. See In re Mashburn, 162 N.C. App. 396. On the

 other hand, respondent-father testified at the adjudicatory hearing that he had

 allowed his mother to enter his home following the surgical procedure that was

 performed upon him because “I didn’t know anybody else that would look after me

 and help me with my recovery[.]” In light of this testimony, we hold that the record

 contains sufficient evidentiary support for the trial court’s finding that respondent-

 father had stated he had no one else other than his mother to assist him during his

 convalescence following surgery.
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

¶ 23 In his penultimate challenge to the trial court’s findings of fact, respondent-

 father argues that the portion of Finding of Fact No. 25 stating that he had “missed

 three consecutive [Child Family Team] meetings” lacked sufficient evidentiary

 support. As the record reflects, a foster care supervisor employed by the Nash County

 DSS testified that respondent-father had participated by telephone in two of the four

 Child Family Team meetings held in connection with the underlying juvenile

 proceeding by phone. More specifically, the foster care supervisor testified that

 respondent-father had participated in a Child Family Team meeting by phone on 26

 July 2018, was absent from a Child Family Team meeting that was held on 23 October

 2018, participated in a Child Family Team meeting by phone on 24 January 2019,

 and was absent from a Child Family Team meeting that was held on 23 April 2019.

 As a result, given that the record provides no support for the trial court’s finding that

 respondent-father had missed three consecutive Child Family Team meetings, we

 will disregard this portion of Finding of Fact No. 25 in determining whether the trial

 court properly determined that respondent-father’s parental rights in Jill were

 subject to termination on the basis of neglect and willful abandonment. In re N.G.,

 374 N.C. at 901.

¶ 24 Finally, respondent-father contends that Finding of Fact Nos. 33 through 38

 constitute “ultimate facts bordering on conclusions of law.” Although the trial court

 labeled the relevant portions of its termination order as findings of fact rather than
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 conclusions of law, its determinations that respondent-father had “displayed a willful

 neglect,” “relinquished all parental claims,” “neglected and abandoned [Jill],” and

 “neglect would [probably] continue if [Jill] were returned to [respondent-father’s]

 care” involve the application of legal principles to the facts rather than factual

 findings. Given that “findings of fact which are essentially conclusions of law will be

 treated as such on appeal,” State v. Sparks, 362 N.C. 181, 185 (2008) (cleaned up), we

 will treat the challenged portions of Finding of Fact Nos. 33 through 38 in that

 manner in evaluating the validity of respondent-father’s remaining challenges to the

 trial court’s adjudicatory decision.

¶ 25 In challenging the trial court’s determination that grounds for terminating his

 parental rights in Jill existed, respondent-father begins by arguing that the trial

 court’s findings of fact did not support its conclusion that his parental rights in Jill

 were subject to termination on the grounds of willful abandonment. The termination

 of a parent’s parental rights in a child on the basis of abandonment pursuant to

 N.C.G.S. § 7B-1111(a)(7) requires proof that “[t]he parent has willfully abandoned

 the juvenile for at least six consecutive months immediately preceding the filing of

 the petition[.]” N.C.G.S. § 7B-1111(a)(7) (2019). “Abandonment implies conduct on

 the part of the parent which manifests a willful determination to forego all parental

 duties and relinquish all parental claims to the child.” In re Young, 346 N.C. 244,

 251 (1997) (quoting In re Adoption of Searle, 82 N.C. App. 273, 275 (1986)); see also
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 Pratt v. Bishop, 257 N.C. 486, 502 (1962) (stating that “[a]bandonment requires a

 willful intent to escape parental responsibility and conduct in effectuation of such

 intent”). In light of that fact, this Court has stated that, “if a parent withholds his

 presence, his love, his care, the opportunity to display filial affection, and willfully

 neglects to lend support and maintenance, such parent relinquishes all parental

 claims and abandons the child.” Pratt, 257 N.C. at 501. “Although the trial court

 may consider a parent’s conduct outside the six-month window in evaluating a

 parent’s credibility and intentions, the ‘determinative’ period for adjudicating willful

 abandonment is the six consecutive months preceding the filing of the petition.” In

 re N.D.A., 373 N.C. 71, 77 (2019) (quoting In re D.E.M., 257 N.C. App. 618, 619

 (2018)).

¶ 26 In view of the fact that the motion to terminate respondent-father’s parental

 rights in Jill was filed on 20 February 2019, the determinative six-month period ran

 from 20 August 2018 through 20 February 2019. In arguing that the trial court erred

 by determining that his parental rights in Jill were subject to termination on the

 basis of willful abandonment, respondent-father notes that he was precluded from

 having any contact with Jill during the relevant period of time, that he fully complied

 with the case plan that was established in Buncombe County and adopted in Nash

 County, and that he never demonstrated that he willfully intended to forego all of his

 parental duties or to relinquish his parental claims to Jill.
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

¶ 27 The trial court’s unchallenged findings of fact indicate that respondent-father

 made child support payments during the relevant six-month period beginning on 4

 January 2019. In addition, the trial court found that respondent-father sent e-mails

 to the maternal aunt with whom Jill had been placed for the purpose of inquiring

 about Jill’s well-being on 18 September 2018, 9 November 2018, 19 December 2018,

 and 27 December 2018. Finally, the trial court found that respondent-father had

 attended a Child Family Team meeting and completed the requirements of his case

 plan during the relevant six-month period. As a result, rather than reflecting a

 willful withholding of his parental love and affection from Jill, the trial court’s

 findings establish that respondent-father took a number of affirmative actions,

 including sending e-mails to the maternal aunt, attending a Child Family Team

 meeting, and satisfying the requirements of his case plan during the relevant six-

 month period in an attempt to show his love, concern, and affection for Jill.

¶ 28 Admittedly, respondent-father did not visit with Jill at any time during the

 relevant six-month period. However, the order adjudicating Jill to be an abused and

 neglected juvenile entered by Judge Boyette precluded visitation between

 respondent-father and Jill until the occurrence of such visits was recommended by

 Ms. Shaw. Subsequently, unchallenged testimony from a foster care supervisor

 employed by the Nash County DSS indicates that respondent-father wished to be

 allowed to visit with Jill and contacted Ms. Shaw for that purpose on at least two
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

occasions. Although the trial court’s unchallenged findings of fact indicate that all

parties believed that Ms. Shaw would make a recommendation regarding the extent

to which visitation between respondent-father and Jill would be appropriate, Ms.

Shaw testified on 13 June 2019 that “it was not, nor was it ever her role to make a

recommendation regarding the father’s visitation” and that she never intended to do

anything other than prepare Jill for a visit with respondent-father in the event that

such visits were allowed to take place. Since all of the parties, including respondent-

father, were expecting a recommendation from Ms. Shaw concerning the extent, if

any, to which respondent-father should be permitted to visit with Jill before such

visits would be allowed, his failure to have personal contact with Jill during the

relevant six-month period was neither voluntary nor attributable to any failure on

his part to seek to visit with Jill. As a result, the trial court erred to the extent that

it determined that respondent-father’s parental rights in Jill were subject to

termination on the basis of willful abandonment pursuant to N.C.G.S. § 7B-1111(a)(7)

due to the absence of visits between respondent-father and Jill. Cf. In re T.C.B., 166

N.C. App. 482, 486–87 (2004) (holding that the trial court’s conclusion that the

parent’s parental rights were subject to termination on the basis of abandonment was

not supported by the trial court’s visitation-related findings given the fact that the

respondent’s attorney had instructed him to avoid contact with the child and the fact
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 that a subsequent protection plan prohibited visitation between the respondent and

 the child).

¶ 29 Although respondent-father could, of course, have done more than he did in

 order to exhibit his concern for Jill, the steps that he did take as reflected in the trial

 court’s findings of fact suffice to preclude a finding that his parental rights were

 subject to termination on the basis of willful abandonment. Simply put, the trial

 court’s findings of fact do not “support a conclusion that respondent-father completely

 withheld his love, affection, and parental concern for the” child, thereby “rendering

 his parental rights in [the child]” subject to termination” for abandonment. In re

 A.G.D., 374 N.C. 317, 325 (2020). As a result, we hold that the trial court’s

 determination that respondent-father’s parental rights in Jill were subject to

 termination on the basis of abandonment must be reversed.

¶ 30 Finally, respondent-father argues that the trial court erred by concluding that

 his parental rights in Jill were subject to termination based upon neglect. A trial

 court may terminate a parent’s parental rights in the event that the parent has

 neglected the juvenile. N.C.G.S. § 7B-1111(a)(1) (2019). A “neglected juvenile” is

 defined as “[a]ny juvenile . . . whose parent, guardian, custodian, or caretaker does

 not provide proper care, supervision, or discipline; or who has been abandoned; . . . or

 who lives in an environment injurious to the juvenile’s welfare[.]” N.C.G.S. § 7B-

 101(15) (2019). “In deciding whether a child is neglected for purposes of terminating
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 parental rights, the dispositive question is the fitness of the parent to care for the

 child ‘at the time of the termination proceeding.’ ” In re N.D.A., 373 N.C. at 80.

 When it cannot be shown that the parent is neglecting his
 or her child at the time of the termination hearing because
 “the child has been separated from the parent for a long
 period of time, there must be a showing of past neglect and
 a likelihood of future neglect by the parent.”

 In re Z.A.M., 374 N.C. 88, 95 (2020) (quoting In re D.L.W., 368 N.C. at 843 (2016))5;

 see also In re N.D.A., 373 N.C. at 80.

¶ 31 As an initial matter, we note that this Court has held that

 [a] trial court is entitled to terminate a parent’s parental
 rights in a child for neglect based upon abandonment
 pursuant to N.C.G.S. § 7B-1111(a)(1) in the event that the
 trial court finds that the parent’s conduct demonstrates a
 “wil[l]ful neglect and refusal to perform the natural and
 legal obligations of parental care and support.”

 In re N.D.A., 373 N.C. at 81 (quoting Pratt, 257 N.C. at 501). In order to conclude

 that “neglect by abandonment” is present, the trial court’s findings must reflect “that

 the parent has engaged in conduct ‘which manifests a willful determination to forego

 all parental duties and relinquish all parental claims to the child’ as of the time of

 5 As this Court noted in In re R.L.D., 375 N.C. 838, 841 n.3 (2020), “a showing of past

 neglect is [not] necessary in order to terminate parental right [on the basis of neglect] in every
 case.” On the contrary, we pointed out in that decision that N.C.G.S. § 7B-101(15) “does not
 require a showing of past neglect if the petitioner can show current neglect.” Id. However,
 given that the record before the Court in this case does contain a finding of past neglect, the
 analysis set out in the text is appropriate for use in evaluating the validity of respondent-
 father’s challenge to the trial court’s determination that his parental rights in Jill were
 subject to termination on the basis of neglect.
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 the termination hearing,” id. at 81, with the trial court being required to consider the

 parent’s conduct over an extended period of time continuing up to and including the

 time at which the termination hearing is being held. Id. at 81–82.

¶ 32 The trial court appears to have incorporated a “neglect by abandonment”

 theory in Finding of Fact No. 33, which states that respondent-father had, for “most

 of [Jill’s] life prior to and including the six months immediately preceding the filing

 of the [m]otion to terminate parental rights,” “displayed a willful neglect and refusal

 to perform the natural and legal obligations of parental care and support” by

 “with[o]ld[ing] his presence, his love, [and] his care” and by “fail[ing] to afford himself

 of the opportunities to display filial affection” so as to neglect Jill. However, the trial

 court’s findings of fact reflect that respondent-father began paying child support on 4

 January 2019, that he attended some of the hearings that were held in the underlying

 juvenile proceeding, that he satisfied the requirements set out in the case plan that

 was adopted by the Buncombe County DSS and the Nash County DSS, that he

 participated in some Child Family Team meetings, that he sent twelve e-mails to the

 maternal aunt with whom Jill was residing for the purpose of keeping informed about

 Jill’s situation, and that he wrote two letters to Jill. Although respondent-father did

 not ever visit with Jill, his failure to do so cannot be directly attributed to any failure

 on his part to seek the right to participate in such visits for the reasons set out in

 greater detail earlier in this opinion. As a result, given that the trial court’s findings
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 of fact fail to establish that respondent-father “manifest[ed] a willful determination

 to forego all parental duties” with respect to Jill, In re N.D.A., 373 N.C. at 81, and, in

 fact, supported the opposite conclusion, the trial court erred to the extent that it

 determined that respondent-father’s parental rights in Jill were subject to

 termination on the basis of a “neglect by abandonment” theory.

¶ 33 A determination that respondent-father did not neglect Jill on the basis of

 abandonment does not, however, end our inquiry concerning the viability of the trial

 court’s conclusion that respondent-father’s parental rights in Jill were subject to

 termination on the basis of neglect. Instead, we note that the trial court also appears

 to have found the existence of the neglect ground for termination on the basis of a

 prior finding of neglect and the likelihood of future neglect as well given its decision

 to “take[ ] judicial notice of the court order in the underlying action adjudicating the

 child as an abused and neglected juvenile” and given its finding that, “[i]n light of

 [respondent-father’s] nearly complete absence from [Jill’s] life prior to the filing of the

 [m]otion to terminate parental rights, it is probable that neglect would continue if she

 were returned to his care.” As a result, we must evaluate the extent, if any, to which

 the trial court’s findings of fact support its determination that respondent-father’s

 parental rights in Jill were subject to termination on the basis of the “prior neglect

 and likelihood of a repetition of neglect.”
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

¶ 34 As we have already noted, in the event that there has been a previous finding

 of neglect and the juvenile has not resided in the parental residence for an extended

 period of time, the principal issue that the trial court is required to consider in

 determining whether the parent’s parental rights in the child are subject to

 termination on the grounds of neglect is the likelihood that the juvenile would

 experience a repetition of the neglect to which he or she had previously been subjected

 in the event that he or she was returned to the parent’s care based upon an analysis

 of the record evidence concerning the situation leading up to and existing at the time

 of the termination hearing. In re N.D.A., 370 N.C. at 80. Although the trial court

 appears to have attempted to utilize this analytical rubric in the termination order,

 its finding that a repetition of neglect was likely in the event that Jill was returned

 to respondent-father’s care rests solely upon respondent-father’s “nearly complete

 absence from [Jill’s] life prior to the filing of the [m]otion to terminate parental

 rights.” In view of the fact that the trial court clearly failed to consider any of the

 evidence concerning events that had occurred prior to the filing of the termination

 motion other than respondent-father’s lengthy absence from Jill’s life or any of the

 evidence concerning events that occurred subsequent to the filing of the termination

 motion in determining the likelihood that the neglect to which Jill had been subjected

 would be repeated in the event that she was placed in respondent-father’s care, the

 trial court’s findings of fact do not suffice to support a determination that respondent-
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 father’s parental rights in Jill were subject to termination on the basis of “prior

 neglect and likelihood of a repetition of neglect” theory.

¶ 35 On the other hand, however, the record contains evidence from which a proper

 repetition of neglect finding could be made in the event that the trial court deemed

 that evidence to be credible. Among other things, the trial court’s other findings of

 fact reflect that respondent-father “made no effort to locate his daughter or inquire of

 her maternal family about her well-being” for a substantial period of time after the

 mother and Jill left Buncombe County, that respondent-father failed to make any

 effort to locate Jill because “he had his hands full with Steven, that Steven had been

 adjudicated to be a neglected and dependent juvenile in Buncombe County based

 upon events that occurred while he was in respondent-father’s custody, that

 respondent-father had failed to complete the psychosexual evaluation that he was

 ordered to receive in Buncombe County in a timely manner, that respondent-father

 did not initially comply with his Buncombe County case plan, that respondent-father

 made no attempt to establish his paternity of Jill until the Nash County DSS

 arranged for the performance of the necessary test, that it was difficult for employees

 of the Nash County DSS to reach respondent-father, and that respondent-father was

 slow in making contact with the maternal aunt after being provided with her e-mail

 address. In addition, the record contains evidence that, while not fully reflected in

 the trial court’s findings of fact, tends to show that respondent-father exhibited
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

 boundary-related limitations in attempting to care for Steven and that Steven

 exposed himself to Jill during a sibling visit Thus, since we believe that the record

 contains evidence from which the trial court could, if it elected to do so, find that a

 repetition of neglect would be probable in the event that Jill was returned to

 respondent-father’s care, we conclude that the portion of the trial court’s order

 determining that respondent-father’s parental rights in Jill were subject to

 termination on the basis of neglect lack sufficient support in the trial court’s findings

 of fact; that the relevant portion of the trial court’s order should be vacated; and that

 this case should be remanded to the District Court, Nash County, for the entry of a

 new order concerning the extent, if any, to which respondent-father’s parental rights

 in Jill are subject to termination on the basis of neglect and, if so, whether it would

 be in Jill’s best interests for respondent-father’s parental rights to be terminated.6

¶ 36 Thus, for the reasons set forth above, we conclude that the trial court’s

 determination that respondent-father’s parental rights in Jill were subject to

 termination on the basis of abandonment and neglect by abandonment lacked

 sufficient support in the trial court’s findings of fact and that the trial court’s

 determination that respondent-father’s parental rights in Jill were subject to

 6 In view of our determination that the trial court’s findings fail to support its
 conclusion that respondent-father’s parental rights in Jill were subject to termination on the
 basis of any of the grounds for termination set forth in N.C.G.S. § 7B-1111(a), we need not
 address respondent-father’s challenge to the trial court’s determination that the termination
 of his parental rights would be in Jill’s best interests.
 IN RE Z.J.W.

 2021-NCSC-13

 Opinion of the Court

termination on the basis of prior neglect and the likelihood of a repetition of neglect

rested upon a misapplication of the applicable law. As a result, the trial court’s

termination order is reversed, in part, and vacated, in part, and this case is remanded

to the District Court, Nash County, for further proceedings not inconsistent with this

opinion, including the entry of a new termination order containing proper findings of

fact and conclusions of law concerning the extent to which respondent-father’s

parental rights in Jill were subject to termination on the basis of prior neglect coupled

with the likelihood of a repetition of neglect and whether the termination of

respondent-father’s parental rights would be in Jill’s best interests.

 REVERSED, IN PART; VACATED AND REMANDED, IN PART.